STEVEN G. KALAR
Federal Public Defender
Northern District of California
HANNI M. FAKHOURY
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone: (510) 637-3500
Facsimile: (510) 637-3507
Email: Hanni_Fakhoury@fd.org

Attorneys for KRISTOPHER SYLVESTER

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>KRISTOPHER SYLVESTER,<br>Defendant. | **Case No.:** CR 20-256-JSW<br>**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**<br>**Court:** Courtroom 1, 4th Floor<br>**Hearing Date:** December 8, 2020<br>**Hearing Time:** 9:00 a.m. |

## INTRODUCTION

No one would envy the life Mr. Sylvester has lived. A chaotic and traumatic upbringing predictably steered him to where he is today, awaiting sentencing in a federal criminal case, with the unpredicted twist of a global pandemic to make the situation somehow worse.

Given his horrific upbringing and drug addiction, and the fact that the pandemic makes any incarceration more difficult than it would be otherwise, he agrees with the government that a downward variance is warranted in this case and respectfully requests the Court sentence him to 30 months in the Bureau of Prisons ("BOP"), to be followed by three years of supervised release.

## STATEMENT OF FACTS

### A. Mr. Sylvester's History and Characteristics.

To put it simply, Mr. Sylvester never had a chance. Presentence Investigation Report ("PSR") ¶ 36. His parents separated when he was young and he spent most of his childhood with his father. His mother was an alcoholic and drug addict; his father was a "functioning addict." PSR ¶¶ 66-67. He moved around Northern California, living in high crime neighborhoods and witnessing violence first hand. His mother had a series of abusive relationships; as a six year old he opened the door of his house to someone who tried to shoot and kill his father. PSR ¶¶ 67-68. Emulating the behavior he saw in his parents, he turned to drugs and alcohol at a young age, trying marijuana for the first time when he was 9 years old, alcohol when he was 10 and methamphetamine when he was 13 years old. PSR ¶ 78.

With drug use came risky criminal behavior, and he found himself in and out of jail on drug charges and property crimes, all driven by his need to get high. The need for protection within the jail system led him to briefly join a gang. But once he decided to drop out of the gang, he felt threatened and made the foolish decision to carry a firearm for protection, leading to this federal offense. PSR ¶ 13.

### B. The Nature and Circumstances of the Offense.

On April 2, 2020, Mr. Sylvester was arrested in connection with to a commercial burglary in Fremont. At the time of his arrest, Mr. Sylvester possessed a firearm. PSR ¶¶ 6-7. He was charged in Alameda County Superior Court and booked and released from jail in order to decrease the jail

population as the first surge of COVID-19 took hold in the Bay Area. After his release, Mr. Sylvester was arrested in Santa Clara in connection with another commercial burglary, and again he was found to be possessing a firearm. PSR ¶ 9. Mr. Sylvester was charged in Santa Clara County Superior Court and again released in order to alleviate overcrowding in the jail.

On May 14, 2020, the federal government charged him with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). The following day, Mr. Sylvester was arrested by federal authorities and he was found to be in possession of yet another firearm and ammunition. This time, Mr. Sylvester would not be released from custody and he has remained in Santa Rita jail since.

**C. Court Proceedings.**

Mr. Sylvester made his initial appearance in federal court on May 20, 2020. PSR ¶ 4. He waived his right to a detention hearing, a preliminary hearing and to be indicted, permitted the government to file an information again him, and entered a plea agreement with the government, admitting to possessing all three guns. PSR ¶¶ 1-4. Although Alameda County has dropped its charges against Mr. Sylvester, he still has pending charges in Santa Clara County.

**D. Mr. Sylvester's Future Rehabilitation Goals and Plans.**



*Mr. Sylvester, Jana and their two daughters in 2017.*

Today, Mr. Sylvester is anxiously sitting in jail during a global pandemic. He has had many opportunities for self-reflection, telling the probation officer he "his behavior has impacted his family and has caused his daughters to grow up without a father. He has hurt people he cares and wants to have the opportunity to raise his daughters." PSR ¶ 13. The people who love him most—his ex-wife Jana, grandmother and mother in law—all know Mr. Sylvester needs help, which involves not just receiving drug treatment, but leaving the Bay Area all together. *See* Exh. A-C. Jana, who has successfully fought

addiction and been sober for the last 8 years while working and caring for their two daughters, has relocated to Shasta County where she plans to have Mr. Sylvester live with her once he has completed his prison sentence. PSR ¶¶ 69, 73.

**SENTENCING ARGUMENT**

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotations omitted). The factors detailed in 18 U.S.C. § 3553 (a) assist the Court in fulfilling this mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985). The sentence recommended in the U.S. Sentencing Guidelines ("U.S.S.G.") is only one factor for district courts to consider in making this judgment, and it may not be weighed more heavily than any other § 3553(a) factor. *Gall*, 552 U.S. at 50; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

Mr. Sylvester respectfully asks this Court to sentence him to 30 months in the BOP, to be followed by three years of supervised release.

**A. Seriousness of the Offense, Respect for the Law and Just Punishment.**

The Supreme Court has explained the factors in § 3553(a)(2)(A)—the seriousness of the offense," the need "to promote respect for the law" and "provide just punishment for the offense"—are the sentencing rationale of "retribution." *See Tapia v. United States*, 564 U.S. 319, 326 (2011) ("a court may not take account of retribution (the first purpose listed in 3553(a)(2)) when imposing a term of supervised release") (emphasis omitted). "The goal of retribution" is the "interest[] in seeing that the offender is repaid for the hurt he caused." *Kennedy v. Louisiana*, 554 U.S. 407, 442 (2008). Yet, the Supreme Court has warned "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quotations omitted).

The "real conduct and circumstances" in this case include Mr. Sylvester's traumatic and chaotic upbringing and lengthy struggle with drug addiction and mental illness, which played a significant role in bringing him before the Court for sentencing.

Trauma during childhood creates higher risks for negative outcomes in life, including health and life opportunities.[1] Supportive and nurturing relationships and environments for children and families are at the "heart of prevention" for children with trauma history. *Id.* Mr. Sylvester certainly did not have that kind of childhood. His father was a functioning drug addict and his mother an alcoholic and drug addict. PSR ¶ 67. He moved around, saw his mother physically abused by her boyfriends, and as a six year, old was present when someone tried to shoot his father in their home. PSR ¶¶ 66-68. He began using marijuana at the age of 9, alcohol at 10 and methamphetamine by 13. PSR ¶ 78.

There can be no question that Mr. Sylvester's mental health conditions, caused by his traumatic past and exacerbated by drug abuse, contributed to his poor judgment in this case. As a recent article in the *New York Times* noted,

> …in a justice system built upon the idea of choice and personal responsibility, experts say the path to trouble may begin long before an individual has any say in the matter. What happens to people in childhood can make a difference in whether they end up in a prison cell, or whether they are even wired to make rational decisions.[2]

It is often claimed that childhood trauma is not an excuse for an adult's behavior, dismissing years of neglect inflicted upon a helpless child because a grown man has had plenty of time to decide what type of adult he should be. However, childhood trauma does not have an expiration date. Indeed, as one Cornell University sociologist told the *New York Times*, trauma is a major factor "that shapes addictive and criminal behavior in adulthood" and is a "huge factor within the criminal justice system."[3] As a doctor with the Centers for Disease Control elaborated, "children's adverse

---

[1] *See* Rhitu Chatterjee, "CDC: Childhood Trauma is a Public Health Issue and We Can Do More to Prevent It," *National Public Radio*, Nov., 2019, https://www.npr.org/sections/health-shots/2019/11/05/776550377/cdc-childhood-trauma-is-a-public-health-issue-and-we-can-do-more-prevent-it.

[2] *See* Audra Burch, "A Gun to His Head as a Child. In Prison as an Adult." *New York Times*, Oct. 15, 2017, https://www.nytimes.com/2017/10/15/us/childhood-trauma-prison-addiction.html.

[3] *Id.*

experiences are a public health problem" as "childhood adversity and stress can chemically change the way our brains work."[4] Thus, Mr. Sylvester's childhood trauma shaped his adulthood and continues to impact him every day of his life. While Mr. Sylvester accepts responsibility for the mistakes that he alone caused, any sentence must take his childhood adversity into account.

Moreover, in determining a "just punishment," the Court must also consider how Mr. Sylvester has and will serve his custodial sentence during the COVID-19 pandemic. Even in the best of times, prisons and jails have "long been known to be associated with high transmission probabilities of infectious diseases."[5] Incarcerated individuals "are at special risk of infection" and "infection control is challenging."[6] Prisons and jails "contain high concentrations of people in close proximity and are breeding grounds for uncontrolled transmission [of infection]."[7] Incarcerated individuals share bathrooms, sinks, and showers. They eat together, and sleep in close proximity to each other. They often lack access to basic hygiene items, much less the ability to regularly disinfect their living quarters. "The conditions and reality of incarceration makes prisons and jails tinderboxes for the

---

[4] *Id.*

[5] Letter from Patricia Davidson, Dean, Johns Hopkins School of Nursing, *et al.*, to Hon. Larry Hogan, Governor of Maryland, Mar. 25, 2020, https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf (co-signed by over 200 faculty members of Johns Hopkins Bloomberg School of Public Heath, School of Nursing, and School of Medicine).

[6] Open Letter from Gregg S. Gonsalves, Assistant Professor, Department of Epidemiology of Microbial Diseases, Yale School of Public Health, *et al.* to Vice President Mike Pence and Other Federal, State and Local Leaders, Mar. 2, 2020, https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf (co-signed by 814 experts in public health, law and human rights).

[7] Letter from Dr. Sandro Galea, Dean, Boston University School of Public Health, *et al.*, to President Trump, Mar. 27, 2020, https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions).




spread of disease."[8] In short, "our jails are petri dishes."[9]

But this is not the best of times. The COVID-19 infection rate within prison generally, and BOP facilities specifically far outpaces the infection rate in the United States, which is currently recording its highest ever number of cases. A recent research letter in the Journal of the American Medical Association ("JAMA") found the COVID-19 case rate for prisoners of 3,251 per 100,000 prisoners was 5.5 times higher than the U.S. population case rate of 587 per 100,000.[10] Similarly, the adjusted death rate from COVID-19 for inmates was three times higher than would be expected if age and sex distributions of the U.S. and prison population were equal. COVID-19 has particularly ravaged the BOP. As of November 30, 2020, more than 24,000 inmates have tested positive for COVID-19 and 145 inmates have died from the disease.[11] Since March 2020, the BOP "modified its operations" to respond to the spread of COVID-19.[12] Inmates are confined to their cells for almost 23 hours a day and social visits and programming have been suspended.

---

[8] Kimberly Kindy, "An Explosion of Coronavirus Cases Cripples Federal Prison in Louisiana," *Washington Post*, Mar. 29, 2020, https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html.

[9] Timothy Williams *et al.*, "'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars," *New York Times*, Mar. 30, 2020, https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html.

[10] Saloner, et al., "COVID-19 Cases and Deaths in Federal and State Prisons," JAMA, Jul. 8, 2020, https://jamanetwork.com/journals/jama/fullarticle/2768249.

[11] *See* https://www.bop.gov/coronavirus/.

[12] *See* BOP, COVID-19 Action Plan (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp.

Mr. Sylvester has already suffered the consequences of the COVID-19 pandemic. After being released twice in order to alleviate jail crowding, he became infected in Santa Rita following his arrest on the federal complaint and was sick for more than two weeks. PSR ¶ 75. Apart from the risk that he could be reinfected, the time Mr. Sylvester has already spent in Santa Rita, and the time he will spend in the BOP, will be more severe than it would be otherwise. That fact should be taken into account by imposing a variance from the Guideline range and imposing a 30 month sentence.

**B. Deterring Criminal Conduct and Protecting the Public.**

A 30 month sentence will deter Mr. Sylvester from possessing a firearm again. Mr. Sylvester acknowledges and is ashamed about his lengthy criminal record. *See* PSR ¶ 25. That record was driven by drug addiction, and he has not suffered any convictions for violent crimes or drug trafficking.

As for protecting the public, given the fact that BOP programming has been curtailed due to the COVID-19 pandemic, the drug and mental health counseling Mr. Sylvester needs to live a law-abiding life will have to come when he is out of custody and on supervised release. Thus, this Court should get Mr. Sylvester out of custody and under the watchful eye of the probation office sooner than later by imposing a 30 month sentence.

**C. Providing Training, Medical Care or Other Treatment.**

"The underlying purposes of sentencing include not only punishment and deterrence, but also the provision of treatment to a defendant in need of it." *United States v. Bad Marriage*, 392 F.3d 1103, 1114 (9th Cir. 2004) (citing 18 U.S.C. § 3553(a)(2)(D)).

Mr. Sylvester suffers from depression, caused by the significant trauma he has experienced and exacerbated by drug abuse. PSR ¶¶ 76, 78. He has only received sporadic mental health and substance abuse treatment, primarily in custody or through the criminal justice system. *Id*. It is clear he will need more programming to turn his life around. But the unfortunate reality is that both Santa Rita and the BOP are limiting treatment services to prevent the spread of COVID-19. In any event, Congress has cautioned courts to recognize that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Indeed, the Supreme Court has explained a district court cannot increase the length of a sentence in order to provide a defendant with

rehabilitative services, and a court determining the length of a prison sentence "should consider the specified rationales of punishment *except for* rehabilitation, which it should acknowledge as an unsuitable justification for a prison term." *Tapia*, 564 U.S. at 327 (emphasis in original).

Given the restrictions on programming due to the pandemic, the best treatment options for Mr. Sylvester must occur out of a custodial setting. That comes by getting Mr. Sylvester onto supervised release sooner rather than later. "Congress intended supervised release to assist individuals in their transition to community life. Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000) (citing 18 U.S.C. § 3553(a)(2)(D)). In addition to getting Mr. Sylvester treatment, placing him on supervised release sooner rather than later will also be more effective at ensuring he is not a danger to the public than a lengthy prison sentence.

**D. <u>The Guidelines Sentencing Range.</u>**

Mr. Sylvester agrees with the Guideline calculations in the PSR. The base offense level is 14 under U.S.S.G. § 2K2.1(a)(6) due to Mr. Sylvester's status as a felon. PSR ¶ 15. A two level upward adjustment applies under U.S.S.G. § 2K2.1(b)(1)(A) because the offense involved three firearms. PSR ¶ 16. Because Mr. Sylvester waived his right to a preliminary hearing and indictment, and pleaded guilty with a plea agreement, a three level downward adjustment for acceptance of responsibility applies under U.S.S.G. §§ 3E1.1(a) and (b). PSR ¶¶ 22-23. The adjusted offense level is therefore 13. PSR ¶ 24. Mr. Sylvester is in criminal history category VI. PSR ¶ 46. The advisory Guideline range is therefore 33-41 months. PSR ¶ 88.

But this Guideline range only takes into account the aggravating factors in Mr. Sylvester's case. The range says nothing about Mr. Sylvester's chaotic upbringing, struggle with drug addiction and mental illness and the fact he caught COVID-19 while in jail, which makes his time in custody harder than it would have been otherwise.

**E. <u>Avoiding Unwarranted Sentencing Disparities.</u>**

While the Court must avoid unwarranted sentencing disparities among defendants with similar records convicted of similar conduct, the Ninth Circuit has explained sentencing courts must also "avoid 'unwarranted similarities among [defendants] who were not similarly situated.'" *United*

*States v. Amezcua-Vasquez*, 567 F.3d 1050, 1058 (9th Cir. 2009) (quoting *Gall*, 552 U.S. at 55 (emphasis and brackets in original)); *see also* 18 U.S.C. § 3553(a)(6).

A 30 month sentence ensures Mr. Sylvester is not unfairly equated with a defendant who actually possessed, brandished or discharged a firearm during a crime of violence. Such a sentence also takes into account Mr. Sylvester's chaotic upbringing, his drug addiction and mental health struggles. Finally, a 30 month sentence ensures Mr. Sylvester is not equated to a defendant going through the federal criminal justice system *before* the pandemic, when there was greater movement and programming opportunities in prison.

## CONCLUSION

Mr. Sylvester respectfully requests this Court sentence him 30 months in the BOP to be followed by three years of supervised release. He also asks this Court to recommend to the BOP that he participate in the Residential Drug Abuse Program ("RDAP").

Dated: December 1, 2020

Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender

/S
HANNI M. FAKHOURY
Assistant Federal Public Defender